IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE NUTRISYSTEM, INC. | : | CIVIL ACTION |
| SECURITIES LITIGATION | : | |
| | : | NO. 07-4215 |
| This document relates to: | : | |
| All Actions | : | MASTER FILE |

MEMORANDUM

McLaughlin, J.                                    August 31, 2009

In this consolidated class action, the lead plaintiff alleges that the defendants, NutriSystem Inc. ("NutriSystem" or the "company"), Chief Executive Officer Michael J. Hagan, Chief Financial Officer James D. Brown, Chief Marketing Officer Thomas F. Connerty, and Chief Information Officer Bruce Blair, committed securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a, and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5. The action is brought on behalf of purchasers of NutriSystem securities between February 14, 2007 and February 19, 2008 inclusive.[1]

NutriSystem is a publicly-traded company that sells weight management products. The plaintiffs allege that the

_____

[1]    Eight separate class actions were initially filed in this court and consolidated by order of Judge Katz and reassigned to this Court on April 15, 2008. The lead plaintiff in the consolidated class action is the Double U Funds. Order of Jan. 3, 2008.  The Double U Funds filed the operative consolidated amended class complaint on March 7, 2008, referred to in this Memorandum as the "complaint."

defendants made false and misleading statements about the company's financial health in the face of competition from Alli, an over-the-counter anti-obesity drug produced by GlaxoSmithKline ("Glaxo") and released in June 2007.  The plaintiffs allege that the statements made by the defendants artificially inflated NutriSystem's stock price and led to shareholder losses when the share price dropped following the company's disclosures on July 24, 2007, October 3, 2007, and February 19, 2008.

The defendants have moved to dismiss the amended consolidated class action complaint on several grounds. Their main arguments for dismissal of the Section 10(b) claims are: (1) that the plaintiffs have failed to satisfy the heightened pleading burden of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, requiring the plaintiff to identify allegedly false statements with particularity and plead facts that raise a strong inference of scienter; (2) that the plaintiffs cannot maintain claims based on NutriSystem's failure to meet earnings estimates announced on July 24, 2007; and (3) that the plaintiffs cannot maintain claims based on events occurring after October 4, the date of the lead plaintiff's final alleged stock purchase.  The defendants further argue that all Section 20(a) claims fail because: (1) the underlying Section 10(b) claims fail; (2) the plaintiffs have not adequately alleged culpable participation by the individual defendants; and (c) the

plaintiffs have not alleged that defendant Blair is a controlling person for purposes of Section 20.

The Court finds that the plaintiffs have not carried their burden of raising a strong inference of scienter under the PSLRA. The Court also finds that the plaintiffs do not have standing to bring claims arising out of statements made after October 4, 2007, nor have the plaintiffs met their burden of alleging false statements with the particularity required by the PSLRA with respect to most of the allegations in the complaint. The Court will grant the defendants' motion.

I.  Allegations of the Complaint and Incorporated Documents[2]

NutriSystem sells a weight management system based on the purchase of a portion-controlled prepared meal program, typically consisting of a 28-day supply of prepared meals. Compl. at ¶ 2.  During the class period, defendant Hagan was

─────────────────

[2]    In analyzing a motion to dismiss under the PSLRA, this Court must examine the complain in its entirety, as well as documents incorporated into the complaint by reference or matters of which a court may take judicial notice.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S.Ct. 2499, 2509 (2007); Winer Family Trust v. Queen, 503 F.3d 319, 327 (3d Cir. 2007). The Court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004); In re Rockefeller Ctr. Props., Inc., Sec. Litig., 311 F.3d 198, 215 (3d Cir. 2002). In analyzing the Motion to Dismiss the Court has considered the allegations of the complaint as well as the complete text of the documents and statements the plaintiffs contend are actionable.

NutriSystem's Chairman and Chief Executive Officer. <u>Id.</u> ¶ 19(a).
Defendant Brown served as the firm's Chief Financial Officer, but
announced on August 10, 2007, that he planned to resign. <u>Id.</u>
¶¶ 19(b), 49. Defendant Connerty was the company's Chief
Marketing Officer and Executive Vice President for Product
Development, and defendant Blair was the company's Chief
Information Officer and Senior Vice President for Operations.
<u>Id.</u> ¶¶ 19(c), 19(d).

Because NutriSystem experiences a high rate of
attrition with its dieting customers, the company has focused on
attracting new customers and closely tracks a metric it calls
"Customer Acquisition Costs" ("CAC"). NutriSystem has used CAC
as a shorthand for the effectiveness of its marketing and
advertising in presentations to investors and analysts. <u>Id.</u> ¶¶
3-4.

On February 7, 2007, Glaxo announced that the U.S. Food
and Drug Administration ("FDA") had approved its weight loss pill
for over-the-counter sale. The drug would be known as Alli and
released to the market on June 15, 2007. Glaxo invested heavily
in marketing and publicity for Alli leading up to and following
the drug's introduction. <u>Id.</u> ¶¶ 6-7. Alli was a tremendous
success initially, acquiring 1,500,000 customers by July 25,
2007, and 2,000,000 customers by the end of the third quarter of
2007. <u>Id.</u> ¶ 9. The complaint alleges that by virtue of their

positions within the company, the defendants were aware of the threat Alli posed to the company's financial health and repeatedly misrepresented that threat in communications to investors and analysts throughout the second half of 2007, ending with the company's announcement of 2007 full-year results on February 19, 2008. Id. ¶¶ 12, 20, 24. The complaint also alleges that defendants Hagan, Brown, Connerty, and Blair ("Individual Defendants"), as senior executive officers or directors of the company, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and are directly liable for securities fraud under that statute. Id. ¶ 21.

The factual allegations are discussed below in greater detail.

A.    February 14, 2007, to July 23, 2007[3]

On February 14, 2007, one week after Glaxo announced the FDA's approval of Alli for over-the-counter sale, NutriSystem issued a press release reporting fourth quarter 2006 results and providing first quarter and full-year guidance for 2007. The company reported fourth quarter revenue of $133,569,000 and net income of $19,607,000, or $0.53 per diluted share. The company

---

[3]    At Oral Argument, the plaintiffs withdrew all claims relating to statements made prior to July 24, 2007. Tr. of Oral Argument at 11, Nov. 24, 2008. The Court incorporates facts from this period as relevant to its findings on the issue of scienter, discussed later.

predicted that 2007 first-quarter revenue would be between $205 million and $215 million, "an increase of at least 40% year-over-year," and that full-year revenue would be between $720 million and $740 million.  Id. ¶¶ 31-32.  Defendant Hagan commented on the results and estimates, noting, "We are very pleased with our start in 2007.  Our advertising continues to perform, our new market segments provide us additional visibility for growth, and our revenue stream from ex-customers is starting strong."  Id.; Defs'. Mot. to Dismiss Complaint ("Defs'. Br.") Ex. 1 at 1. Brown referred to NutriSystem's former customers as "a growing pool of people . . . offer[ing] us rather larger opportunity over the next several years."  Id. Ex. 2 at 2.  On February 15, 2007, the share price of NutriSystem's common stock closed at $49.79, up $5.91.  Compl. ¶ 34.

On April 25, 2007, the company issued a press release announcing first quarter results and providing guidance for the remainder of 2007.  The company exceeded its first quarter guidance, reporting revenues of $238,360,000.  Id. ¶ 35.  In the press release, Hagan attributed part of the company's first quarter success to "ongoing expansion of our pool of ex-customers," Defs'. Br. Ex. 4 at 1, and the company raised its estimate of 2007 full year revenues to between $790 million and $805 million.  Compl. ¶ 36.  Hagan added:

> 2007 is shaping up to be a very good year for
> us.  Our 2007 strategy is to focus on three

6

> areas:  profitable new customer growth across
> all market segments – women, men, and
> seniors; continue to improve retention and
> reactivation efforts and invest in product
> areas such as our new 2008 weight loss
> program that advance customer health while
> growing the lifelong value of each customer.

Id. (internal quotation marks omitted).  The company's share price rose $5.05 per share over the following two days and closed at $63.29.  Id. ¶ 38.

Consistent with Glaxo's announcement in February, Alli began over-the-counter sales on June 15, 2007.  Id. ¶ 39.

B.    July 24, 2007, to October 4, 2007

1    The July 24, 2007, 2Q Earnings Announcement and Conference Call

On July 24, 2007, NutriSystem announced its second quarter financial results, third quarter estimates, and full-year guidance in a press release.  Id. ¶ 40.  The company reported revenues of $213,556,000 for the second quarter, and CEO Hagan stated, "[t]he quarter was a very good one and we were pleased with the solid growth in our core women's market and continued strength in revenue coming from our ex-customers."  Id.  CFO Brown noted the company's

> [s]ubstantial investments in the business to
> improve future profitability including a new
> e-commerce platform, the new food program, a
> new call center and international expansion.
> To date we've used our strong cash flow to
> fund stock buy-backs.  In the first half of
> 2007, we generated net cash from operations

7

                of $98 million and repurchased 2.0 million
                shares for $98 million.

Id.  In the press release, NutriSystem estimated third quarter

revenues between $200 million and $208 million, and raised its

full year 2007 revenue guidance to between $810 million and $820

million.  The press release quotes CEO Hagan as saying, "[t]he

business performed extremely well for the first half of 2007.  We

continue to be excited about the new market segments we've

launched in the past year and even more excited about how often

our ex-customers are returning to us."  Id. ¶ 41.

A conference call with securities analysts was held the

same day.  Id. ¶ 42.  CFO Brown prefaced the discussion with

analysts by saying:

> I would like to remind everyone that this
> announcement contains forward-looking
> statements that involve risks and
> uncertainties.  Such information includes
> statements about NutriSystem's second quarter
> financial results as well as statements that
> are preceded by, followed by, or include the
> words believes, plans, intends, expects,
> anticipates, or similar expressions.
> Statements regarding NutriSystem's outlook
> and guidance for the third quarter of 2007
> and the full year of 2007, its expectations
> regarding its ability to continue its growth
> while maintaining costs, and similar other
> statements that are not statements of
> historical facts constitute forward-looking
> statements.  For such statements, NutriSystem
> claims the protection of the Safe Harbor for
> forward-looking statements contained in the
> Private  Securities Litigation Reform Act of
> 1995. . . .

> Factors that could cause actual results to
> differ from those contained in the forward-
> looking statements include but are not
> limited to those factors set forth in
> NutriSystem's annual report on Form 10-K for
> the year ended December 31, 2006, which has
> been filed with the SEC.[4]

Defs'. Br. Ex. 7 at 1.  The risk factors enumerated in the

company's 2006 Form 10-K stated, in pertinent part:

> Our future growth and profitability will
> depend in large part on the effectiveness and
> efficiency of our marketing . . . .  The
> weight management industry is highly
> competitive. . . .  New weight loss products
> . . . may put us at a competitive
> disadvantage.  The creation of a weight loss
> solution, such as a drug therapy, that is
> perceived to be safe, effective, and "easier"
> than a portion-controlled meal plan would put
> us at a disadvantage in the marketplace and
> our results of operations could be negatively
> affected.

Defs'. Br. Ex. 3 at 10, 12.

During the July 24 call with analysts, Hagan noted a

"slight softness in demand" for NutriSystem "starting in late

June and carrying into early July."  Compl. ¶ 42.  Hagan added,

"We believe the launch of a new over-the-counter weight loss pill

---

[4]     In each of the company's press releases and earnings
calls at issue in this case, NutriSystem's Chief Financial
Officer made a similar statement invoking the PSLRA Safe Harbor
for forward-looking statements and referencing the risk factors
identified in the company's 2006 Form 10-K. The disclaimer in the
July 24, 2007 press release identified "guidance for the second
quarter" as protected by the safe harbor, Defs'. Br. Ex. 6 at 2,
although this appears to have been a typographical error. By July
24, 2007, the second quarter had ended and the press release on
that date concerned guidance for the third quarter.

with significant PR and media behind it has had an effect, and
based on information we have this is fully reflected in our
guidance for the remainder of the year." <u>Id.</u>  In response to a
question from Citigroup analyst Gregory Badishkanian on the
drug's effect, Hagan described the company's 2007 guidance as
"classically conservative," and noted that the softening of
demand for NutriSystem

> might be related to the launch of [Alli] from
> [Glaxo] and the big PR and media blitz
> surrounding it. . . . [B]ut we also believe
> that while demand has been picking up over
> the last week or so we provided guidance in .
> . . a conservative fashion to reflect what we
> have been seeing over the past month and that
> includes the last couple weeks of June.

<u>Id.</u>; Defs'. Br. Ex. 7 at 7.

> Hagan also said:

> [W]e believe [Alli's effect] is just a
> temporary type of thing. . . .  First half of
> June was really solid, and then we had a bit
> of [a] hiccup but recognizing that we had the
> hiccup we reined in a little bit Q3 guidance.
> But still when you look at growth year-over-
> year we're going to have a very solid year.

<u>Id.</u>  In response to a question asking whether the comeback in
demand was "across-the-board," Hagan responded affirmatively.
<u>Id.</u> ¶ 46.

        Later in the call, an analyst asked if the company was
making any marketing plan adjustments as a result of Alli's
competition.  <u>Id.</u> ¶ 44.  Chief Marketing Officer Connerty
responded:

> [I]n areas where we have seeing [sic]
> marginal buys not perform as well as they
> have in previous quarters we've cut them back
> based on softness in demand. . . .  One of
> the nice aspects of our business model is the
> fact that we can adjust relatively quickly on
> our media spend and when we are seeing
> competitive influences kind of push our
> acquisition costs up a little bit we can
> adjust accordingly and pull back on our
> spending. . . .  [T]he implied statement of
> the fact that we are seeing softening in
> demand naturally equates to an increase in
> CAC.

Id.  Connerty also said, "[L]ike everything we do we test

[marketing campaigns] so it is not likely we'd go out there

overly aggressively with a campaign that wouldn't yield positive

return on the media investment."  Id.  The company's share price

fell $6.88 per share to close at $56.90 on July 25, 2007.  Id.

¶ 47.


2    Allegations by Confidential Informants of
     Deteriorating Business after July 2007

The complaint alleges that, according to a former

NutriSystem employee, in early August 2007 the business "had so

weakened that a hiring freeze was imposed on the Customer Service

Division of the company's Call Center," and that "[t]he number of

employees in the Call Center is largely a function of revenues

and the volume of orders."  Id. ¶ 48.  The complaint also alleges

that, according to a former weight loss counselor, NutriSystem

began layoffs in the Call Center by October 2007.  Id. ¶ 51.

According to the same weight loss counselor, by November 2007, calls had decreased even further and call center layoffs were occurring regularly.  Id. ¶ 58.


       3.   The August 10, 2007 Press Release

On August 10, 2007, the company issued a press release announcing the "planned departure" of Chief Financial Officer Brown.  Id. ¶ 49; Defs'. Br. Ex. 8.  In the press release, Hagan described Brown as "leav[ing] the company in excellent financial condition," and Brown commented that "[c]ombined with a fundamentally strong business model, healthy balance sheet and growth catalysts in the horizon, I believe NutriSystem is well positioned to continue its success."  Compl. ¶ 49.  The press release included a forward-looking statement disclaimer and identified risks and uncertainties by reference to the company's Form 10-K.  Defs'. Br. Ex. 8.


       4   The October 3, 2007 Preliminary Earnings Announcement

On October 3, 2007, NutriSystem issued a press release announcing preliminary third quarter 2007 results and revising guidance for the remainder of 2007.  Id. ¶ 52.  The company announced expected third quarter revenues of $188 million, which was below the guidance of $200 million to $208 million announced

on July 24.  Id. ¶¶ 41, 52.  Hagan acknowledged the shortfall,
and announced:

> We continue to be satisfied with our success
> in reactivating former customers, but our
> performance with new customers we believe was
> affected by shorterterm competitive pressures
> which caused our marketing dollars to become
> less efficient, resulting in fewer new Direct
> Business customers than anticipated and
> customer acquisition costs to be higher than
> anticipated.

Id. ¶ 52.  Brown, as acting CFO, also stated that the company
expected customer acquisition costs to be "between $212 and $216"
in the third quarter.  Defs'. Br. Ex. 9 at 1.  Following the
announcement, NutriSystem's share price fell by 34% to close at
$31.59.  Compl. ¶ 53.

On October 4, 2007, lead plaintiff, The Double U Funds,
made its final purchase and sale of NutriSystem common stock.
Pl.'s Mot. to be Appointed Lead Plaintiff (Docket No. 15), Ex. C
(cited in Defs'. Br. Ex. 18).

C.   October 5, 2007 to February 19, 2008

1   The October 24 3Q Earnings Announcement and
Conference Call

On October 24, 2007, the company issued a press release
announcing financial results for the third quarter, confirming
most of the guidance provided on October 3rd, including third
quarter revenues of $188 million.  Compl. ¶ 54.  Hagan announced
an increase in customer acquisition costs to $214 from $143 in

the third quarter of 2006.  Id.  The press release announced estimates of full-year revenue between $770 million and $776 million, flat fourth quarter year-over-year revenues, and a 20% decline in year-over-year fourth quarter new customer acquisitions.  Id. ¶ 55.  The press release was accompanied by a disclaimer invoking the PSLRA safe harbor for forward-looking statements.  Defs'. Br. Ex. 9 at 2.

The company had a conference call with analysts that day, acknowledging the failure to meet the guidance provided in the July 24th announcement.  Hagan noted:

> As we stated in our October 3rd press release there were competitive pressures in Q3 greater than what we anticipated.  We attribute most of the it [sic] to a new entrant into the diet category. Specifically, an new [sic] over-the-counter pill was launched in US [sic] in late June. The parent company [Glaxo] just announced yesterday that they had 2 million diet starts in the US since it launch [sic]. Put simply that's a lot of starts going to an alternative weight loss approach in a short period of time.
>
> We were only down 7% new customer starts from Q3 of 2006. In some ways, we are satisfied by the way our business responded during a quarter with such acute pressure from a new entrant. . . .
>
> We provided guidance on July 24th expecting 245,000 new customers for the quarter, and we acquired 218,000; we are about 11% shy of our projections.  The disparity in customer counts, which is diretly related to marketing efficiency, explains a lot about why we relate in revenue and [earnings per share].

In essence, our marketing to drive new customers wasn't yielding

> the return that we originally expected.  However, we do continue
> to be satisfied with our reactivation business, as our base of
> ex-customers has     largely not been
>                      impacted by the new over-
>                      the-counter pill.

Id. Ex. 11 at 2; Compl. ¶ 56.  Brown acknowledged the increase

in CAC compared to the third quarter of 2006 and said the

company believed the increase was "largely caused" by Alli's

introduction.  Compl. ¶ 57.  Brown also preceded the call with a

disclaimer invoking the PSLRA safe harbor for forward-looking

statements.  Defs'. Br. Ex. 11 at 1.  NutriSystem's stock price

closed at $27.50 on October 24 and at $30.55 on October 25.  Id.

Ex. 19.


        2.   February 19, 2008 4Q and 2007 Press Release and
           Conference Call

On February 19, 2008, NutriSystem discussed 2007 fourth

quarter and full year results with analysts in a conference call.

By this point, Brown had left the company and his replacement,

David Clark, was the Chief Financial Officer; Clark invoked the

PSLRA safe harbor for forward-looking statements at the beginning

of the call.  Id. Ex. 12 at 1.  CEO Hagan announced full year

revenues of $777 million and fourth quarter revenues of $137

million, which increased 3% over the previous year.  Id. Ex. 12

at 2.  Hagan also announced an 18% decline in new customers in

the fourth quarter.  Id.; Compl. ¶ 59.

CFO Clark then discussed 2007 financial results in greater detail and discussed earnings estimates for 2008; the company announced lower expected revenues for 2008 of between $690 million and $710 million.  Defs'. Br. Ex. 2 at 4.  Clark also added:

> As you have heard and will hear our management is focusing on operating our company as a recurring revenue model that focuses not just on first-time customers but on generating maximum profitability over their time with us.  Consequently, we will be directing increasing portions of our marketing and promotional spending toward extending length of stay and increasing the instance of reactivations.
>
> Accordingly we will measure our success on adjusted EBITDA [earnings before income, taxes, depreciation, and amortization] generation and the consequent margin as compared to our revenue.  And so consistent with subscriber-based businesses [sic] and we are also consistent with our peers, commencing in the first quarter we will move our focus towards gross margins, marketing as a percentage of sales, and adjusted EBITDA margins.  And you will see us move away from CAC, revenue per customer and other new customer focused metrics.  While continuing to use these tactical metrics to make day-to-day operating decisions, we will have our strategic focus on long-term profitability.

Id.; Compl. ¶ 59.  The company's share price declined from $23.89 per share to $16.58 per share on February 20, 2008.  Compl. ¶ 59.

II.    The Complaint and Motion to Dismiss

        The complaint contains two counts:  Count One,
violation of Section 10(b) of the Securities Exchange Act of 1934
and 17 C.F.R § 240.10b-5 (together, "Rule 10b-5"), brought
against Hagan, Brown, Connerty, Blair, and the company; and Count
Two, violation of Section 20(a) of the Exchange Act, brought
against the individual defendants.  The plaintiff claims that as
a result of the material misrepresentations and omissions
alleged, NutriSystem's common stock traded at artificially
inflated prices throughout the class period and led to losses as
a result of the company's disclosures on July 24, 2007, October
3, 2007, and February 19, 2008.

        The defendants have moved to dismiss the complaint,
arguing that:  (1) the plaintiff has failed to allege with
particularity the false statements that are the basis for its
claim; (2) the plaintiff has failed to adequately allege
scienter; (3) the plaintiff may not maintain claims based on
NutriSystem's failure to meet guidance issued on July 24, 2007;
(4) the plaintiff cannot maintain claims based on events
occurring after October 4, 2007 for lack of standing and a
failure to allege materiality or causation; (5) the plaintiff's
Section 20(a) claims fail because (a) the underlying Rule 10b-5
claims fail; (b) the plaintiff has not alleged culpable
participation on the part of the individual defendants; and (c)

17

with respect to CIO Blair, the plaintiff has not alleged that he is a controlling person under the statute.

The complaint alleges that the defendants made false and misleading statements and omissions of material fact necessary to make their statements not false or misleading. Compl. ¶ 62. The complaint alleges that these statements and omissions "failed to disclose material adverse information and misrepresented the truth about the company, its business and operations." <u>Id.</u> The complaint alleges that these statements were materially false and misleading at the time because they omitted "adverse facts which were known to defendants or recklessly disregarded by them." Id. ¶ 63. The specific facts omitted are alleged as follows:

> (a) that the company was signing up fewer new customers and was not performing according to guidance furnished to securities analysts;
>
> (b) that the company's costs of acquiring new customers were significantly increasing;
>
> (c) that the company's performance was being and would continue to be negatively impacted by competition from Alli;
>
> (d) that Hagan falsely and misleadingly represented on July 24, 2007 that Alli presented a "slight softness," a "temporary" problem, and a "near-term hiccup," when, in fact defendants knew there would be sustained negative impact for the rest of 2007 and, possibly, beyond;
>
> (e) that Connerty falsely and misleadingly depicted NutriSystem's ability to successfully and quickly meet the major

18

challenge created by Alli because this was but a "temporary" "hiccup";

(f) that the representation that NutriSystem still had a strong business model was false because defendants knew that, as a result of Alli's sales, NutriSystem's CAC was continuously rising and its ability to attract new customers was seriously impaired, rendering the company's business model all but obsolete; and

(g) that as a result of the foregoing, defendants lacked a reasonable basis for their positive statements about the company and its prospects.

<u>Id.</u>

Finally, the complaint alleges that the defendants knew of or recklessly disregarded the false and misleading nature of the documents and statements at issue because they were privy to contradictory confidential information regarding the company's true competitive position.  <u>Id.</u> ¶ 65.  Further, the complaint cites sales of NutriSystem shares by Blair, Connerty, and Hagan between April 4, 2007, and June 4, 2007, as well as sales by Brown between May 10, 2007, and September 10, 2007.  <u>Id.</u> ¶ 66. The Court will grant the motions to dismiss both the Rule 10b-5 claim and the Section 20(a) claim.  The Court finds that with respect to the factual allegations in the complaint the statements at issue have not been pled with the specificity required by the PSLRA, are protected by the PSLRA safe harbor for forward-looking statements, or are too vague to be actionable. The Court also finds that the plaintiff does not have standing to

bring claims arising from statements made after October 4, 2007, and has not adequately pled materiality or causation with respect to statements made on October 24, 2007, and February 19, 2008. With respect to the entire complaint, the Court concludes that the plaintiff has failed to raise the strong inference of scienter required by the PSLRA.  Because the Rule 10b-5 claims fail, the Court will dismiss the Section 20(a) claims for failure to allege an independent violation of the securities laws.

III. <u>Discussion</u>

Section 10(b) of the Exchange Act forbids a person, through the use of any means of interstate commerce, the mails, or any national securities exchange, to employ any manipulative or deceptive device or contrivance in contravention of rules promulgated by the SEC.  15 U.S.C. § 78j.  SEC Rule 10b-5 forbids the making of any "untrue statement of a material fact," the omission of any material fact necessary to make a statement not misleading, or engaging in any practice that operates as a fraud or deceit upon any person in connection with the purchase or sale of any security.  17 C.F.R. § 240.10b-5.  The United States Supreme Court has found an implied private right of action under Rule 10b-5.  <u>Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.</u>, 552 U.S. 148, 128 S.Ct. 761, 768 (2008).  The six basic elements of the action are:  (1) a material misrepresentation or

omission; (2) scienter -- the defendant's intent to deceive, manipulate, or defraud; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 341-42, 125 S.Ct. 1627 (2005).

A.    Scienter

Claims under Rule 10b-5 are subject to the heightened pleading standards of the PSLRA generally.  In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002). The scienter requirement of a Rule 10b-5 claim is also subject to PSLRA pleading standards.  15 U.S.C. §78u-4(b)(2).  With respect to each act or omission, a plaintiff must identify each statement alleged to have been misleading, specify the reasons why it is misleading, and state with particularity the facts that give rise to a strong inference that the defendant acted with the required state of mind.  Tellabs v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S. Ct. 2499, 2507-08 (2007).  To survive a motion to dismiss, the inference of scienter must be cogent and at least as compelling as any competing nonculpable inference plausibly drawn from the facts alleged and taken as a whole.  Id. at 2509.

Tellabs established a three-step process for a court evaluating a motion to dismiss a Section 10(b) claim.  First a

21

court must, as with any Rule 12(b)(6) motion, accept all factual allegations in the complaint as true.  Second, the complaint, in addition to documents incorporated by reference and matters of which a court may take judicial notice, must be taken in its entirety.  Finally, the court must take into account plausible nonculpable opposing inferences in determining whether the plaintiff's proposed inference of scienter is "strong" within the meaning of the PSLRA, i.e., whether a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged. Id., 127 S. Ct. at 2509.

The United States Court of Appeals for the Third Circuit had interpreted the PSLRA standard in a Rule 10b-5 claim to allow scienter to be pled by alleging facts sufficient to establish motive to commit fraud and the opportunity to do so, or by alleging facts establishing circumstantial evidence of reckless or conscious behavior.  In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534-35 (3d Cir. 1999).  Following Tellabs, courts were unclear as to whether the "taken as a whole" language from that decision allowed courts to continue to separate the analysis of motive-and-opportunity from the analysis of conscious misbehavior or recklessness.  See, e.g., In re Radian Sec. Litig., 612 F. Supp. 2d 594, 608 (E.D. Pa. 2009).

The United States Court of Appeals for the Third
Circuit clarified the means by which a plaintiff may raise an
inference of scienter following Tellabs in Institutional
Investors Group v. Avaya, Inc., 564 F.3d 242 (3d Cir. 2009).  The
Avaya court held that motive and opportunity alone no longer may
give rise to a strong inference of scienter, though they may
contribute to the analysis. Id. at 277. Instead, courts are
required to evaluate the complaint as a whole and consider
whether the plaintiff's proposed inference is at least as strong
as any opposing nonculpable inference.  Tellabs, 127 S. Ct. at
2509.

The Tellabs standard was also applied in Winer Family
Trust v. Queen, 503 F.3d 319 (3d Cir. 2007).  In Winer, the
plaintiff alleged that the defendant company issued a misleading
press release on February 20, 2002, declaring a new facility it
had agreed to purchase was "perfectly suited" to the company's
needs, and would need only "minimal improvement."  Id, 503 F.3d
at 327.  After a walkthrough of the property, the company
disclosed on April 17, 2002, that the cost of purchasing and
renovating the facility would be between $8 million and $16
million, and later revised that figure to between $11.5 million
and $16 million in May 2002.  Id. at 328.  The Winer district
court found that the most plausible inference from this set of
alleged facts was that the company revised its initial cost

estimates as it gained more information about the renovation. The court of appeals upheld the finding, holding that the plaintiff's proposed inference of scienter was neither cogent, nor compelling, nor strong in light of competing inferences.  Id. at 329.

Here, the plaintiff's proposed inference of scienter is presented by allegations of actual knowledge, constructive knowledge on a "core business" theory, and self-interested stock sales by directors.  The Court finds that, taken in its entirety, the complaint fails to raise an inference of scienter that is strong in light of competing nonculpable inferences.

### 1.    Knowledge of Alli's Effect on NutriSystem Sales

The plaintiff attempts to raise an inference of scienter by arguing that the defendants were aware that Alli's impact on NutriSystem's business would be dramatic and sustained, and that the individual defendants' sales of stock show motive and opportunity to take advantage of NutriSystem's allegedly inflated share price.  The plaintiff's allegation of knowledge is based on an alleged weekly internal report distributed by management to officers and executives listing "new memberships, sales, cancellations, competitive factors, and other information concerning the company and its operations."  Compl. ¶ 20.

The complaint also alleges knowledge on the part of the defendants through other "internal corporate documents, conversations, and connections with other corporate officers and employees." Compl. ¶ 20. The plaintiff's further allegations, made via former employees, regarding a hiring freeze and layoffs in the company's call center also constitute circumstantial evidence of knowledge or recklessness with respect to Alli's impact on NutriSystem's business. Id. at ¶ 51, 58.

The plaintiff has also alleged that the defendants knew of the falsity of their statements base on the close proximity of events occurring after those statements were made. Specifically, Glaxo released preliminary sales figures for Alli on July 25, 2007, and the plaintiff contends that this news did not come as a surprise to the defendants, who had been monitoring Alli's effect on sales. 11/24/08 Tr. at 34-35. The complaint does not allege how the defendants would have been aware of Alli's sales figures absent the press release from Glaxo.

2.    Knowledge of Alli's Impact as "Core Business"

The plaintiff also relies on a "core business" theory, which allows for scienter be pleaded through the combination of an officer's position within the company and fraud allegations related to the corporation's core business. See In re Loewen Group Inc., 2004 WL 1853137 at *22 (E.D. Pa. Aug. 18, 2004). The

25

<u>Loewen Group</u> plaintiffs alleged fraud with respect to accounting practices against the company's Chief Financial Officer, among others, and the district court concluded that, on the basis of his position, the defendant knew or should have been aware of the alleged fraudulent accounting practices taking place.  <u>Id.</u>  It is unclear what knowledge the plaintiff seeks to impute to which defendant on this theory;  the complaint does not make such specific allegations of scienter.  The PSLRA's abrogation of the group pleading doctrine requires the plaintiff to establish a culpable state of mind on the part of each defendant individually.  <u>Winer</u>, 503 F.3d at 337.  The plaintiff has not done so here.

The inference of scienter asserted by the plaintiff is based on the allegation that Alli's impact on NutriSystem's sales, customer acquisition costs, and "business model" was more severe and sustained than anticipated.  Because the company's business model allegedly depended on marketing efforts, the plaintiff contends that the individual defendants must have known about Alli's effect, rendering its public statements regarding the company's "strong" business model or Alli's "temporary" effect knowingly misleading.

3.    Stock Sales by Individual Defendants

The plaintiff seeks to bolster its inference of scienter by pointing to sales of stock by the individual defendants as well as other company officers throughout the class period that "further motivated [them] to engage in this course of conduct." Compl. ¶ 66.  Insider trading will support an inference of scienter if the sales are unusual in timing or scope.  See Advanta, 180 F.3d at 538; Wilson v. Bernstock, 195 F. Supp. 2d 619, 635 (D.N.J. 2002) (identifying factors bolstering scienter inference as "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved").  See also In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1424 (3d Cir. 1997).

During the class period, Hagan sold a total of 60,000 shares on June 1 and June 4, 2007, for total proceeds of $4.01 million; Connerty sold a total of 125,000 shares between April 4 and June 4, 2007, for total proceeds of $7.81 million; and Blair sold 41,667 shares of stock on May 2, 2007, for total proceeds of $2.58 million.  Brown sold a total of 47,000 shares on May 10, June 11, July 10, and September 10, 2007, for total proceeds of $2.94 million. Compl. ¶ 66.  With the exception of Brown, no defendant sold shares after Alli was released to the market; all defendants continued to retain a large portion of their holdings in NutriSystem following each sale.  See Defs'. Br. Ex. 13-15

(Forms 4).  The plaintiff has not offered any evidence indicating
that these sales were suspicious in timing or scope, furthering
an inference of scienter; it is the plaintiff's responsibility to
plead facts supporting his inference.  See Advanta, 180 F.3d at
540 n.10.

The defendants note that each of these sales was made
pursuant to a Rule 10b5-1 plan.  Defs'. Br. at 28; Id. Ex. 13-15
(Forms 4 disclosing insider trading pursuant to plans).  A Rule
10b5-1 plan prearranges stock transactions and provides an
affirmative defense to an allegation of insider trading, provided
the plan is adopted in writing prior to becoming aware of
material non-public information.  17 C.F.R. § 240.10b5-1(c).  The
plaintiffs have not alleged that the defendants' plans were
adopted at a time when any defendant was aware of material
nonpublic information.

### 4.   Strength of Scienter Inference

As noted, courts must evaluate a plaintiff's proposed
inference of scienter at the motion to dismiss stage to determine
if it is strong in light of competing inferences.  The plaintiff
argues that the defendants have failed to demonstrate that any
inference of nonculpable conduct is stronger than the inference
of scienter raised in the complaint.  Opp'n Br. at 7.  The
plaintiff's argument is misguided.  In evaluating the plaintiff's

proposed inference of scienter on a motion to dismiss, it is the
court, not the defendant, that is responsible for raising and
weighing competing nonculpable inferences.  Tellabs, 127 S. Ct.
at 2510.

　　　　The Court finds that the plaintiff's inference of
scienter is not compelling in light of competing nonculpable
inferences.  Viewing the complaint in its entirety, the most
plausible inference from the facts as alleged is that the
defendants were aware of the threat posed by an over-the-counter
weight loss pill, and by Alli specifically, but genuinely
believed any effect on NutriSystem sales and financial
performance would be short-lived as customers experienced
unpleasant side effects and discontinued using Alli.  As
information became available regarding Alli's impact,
NutriSystem's officers disclosed it, along with their continued
belief that Alli's impact would be temporary.  Such an inference
is stronger than the plaintiff's proposed inference of scienter.
Because the Court finds the plaintiff has not met its burden of
raising a strong inference of scienter on the part of any
defendant, all 10b-5 claims will be dismissed.

29

B.    <u>Failure to Allege Material False Statements</u>[5]

Allegations that a defendant made an untrue statement or omission of material fact require that a plaintiff specify with particularity all statements alleged to have been misleading and the reasons why each statement was misleading.  If an allegation is based on information and belief, all facts on which the belief is formed must be specified.  15 U.S.C. § 78u-4(b)(1)(B); <u>Winer</u>, 503 F.3d at 326.  Where Rule 10b-5 claims are brought against multiple defendants, a pleading must specify the role of each defendant and their connection to the misstatements or omissions.  <u>Id.</u> at 336.

Rule 10b-5 claims must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure Rule 9(b) and the PSLRA.  At a minimum, Rule 9(b) requires that the plaintiff support allegations of securities fraud with the essential factual background accompanying "the first paragraph of any newspaper story," i.e., the "who, what, when, where and how" of the events in question.  <u>In re Rockefeller</u>, 311 F.3d at 217.  Rule 9(b) requires that a plaintiff show that the person responsible for the misstatement or omission alleged had knowledge of its false or misleading character at the time.  <u>Id.</u> at 216.  The PSLRA's particularity requirement applies to all

---

[5]    Though a finding that the plaintiff has failed to adequately allege scienter is dispositive of the Motion to Dismiss, the Court will address the defendants' other arguments.

30

allegations and covers both scienter and allegations of a statement's falsity.  <u>Avaya</u>, 564 F.3d at 263.  The Court concludes that the plaintiff has failed to plead its factual allegations with the specificity required by the PSLRA, and that many of the statements alleged to be false are protected by the PSLRA's safe harbor for forward-looking statements, rendering them immaterial as a matter of law.

### 1    Failure to Allege False Statements with Specificity

The defendants contend that the plaintiff does not adequately state with specificity which statements in the complaint are misleading or contain material omissions, and why those statements are false or misleading.[6]  In paragraph 63 of the complaint, the plaintiffs allege that "[t]he statements referenced above in the preceding paragraphs were misleading when made because they misrepresented or failed to disclose . . . adverse facts known to the defendants or recklessly disregarded by them."  Compl. ¶ 63.  The Court finds that the only sections of the complaint that adequately plead false statements are paragraph 63(d) (stating that Hagan falsely represented on July

---

[6]    At oral argument, the plaintiff conceded its claims that the defendants made any false or misleading statements prior to July 24, 2007.  11/24/08 Tr. at 11.  The plaintiff also conceded all claims alleging that Blair made false or misleading statements in violation of Rule 10b-5.  <u>Id.</u> at 10.

24 that Alli's impact was "temporary," though he knew impact throughout 2007 would be "sustained") and paragraph 63(f) (referencing paragraph 49, in which the complaint alleges Brown misrepresented the company's business model as "strong" on August 10 despite knowing the company's customer acquisition ability was "seriously impaired"), because these are the only allegations of false or misleading statements in the complaint that are pled with the specificity required by the PSLRA and Rule 9.

### a.   Allegations in Pleadings

The plaintiff's opposition brief argues that the allegations in paragraph 63 indicate false and misleading statements with adequate specificity.  Opp'n at 4-5.  The Court disagrees.  For example, sections (b) and (c) of paragraph 63 allege that NutriSystem's customer acquisition costs were increasing and that the company's performance was and would continue to be hampered by competition from Alli.  These allegations cannot apply to statements made after October 24, 2007, because the company disclosed in their press release on that day that those costs were increasing and that NutriSystem's marketing efforts were hurt as a result of competitive pressures from new market entrants.  See Defs'. Br. Ex. 10 at 1.

By deduction, the allegations of paragraph 63(b)-(c) could only apply to the statements made on July 24 and October 3,

2007, though the complaint does not say so, nor does it disclose what additional information regarding customer acquisition costs or competitive pressure was known but not disclosed at the time. Paragraph 63(e) alleges that Connerty provided a misleading picture of NutriSystem's "ability to successfully and quickly meet the major challenge created by Alli," though similarly does not describe what statements were misleading. Liberally construing the complaint would suggest that paragraph 63(e) applies to Connerty's statements identified earlier, in which he describes NutriSystem's ability to "adjust [media spending] relatively quickly" when competitive pressures influence customer acquisition costs, and tells an analyst that NutriSystem would be unlikely to pursue a marketing campaign too aggressively if the company didn't believe it would be successful. Compl. ¶¶ 44-45. Still, the allegation fails to identify what additional information should have been disclosed or what facts were known to Connerty that rendered his statements misleading.

As discussed above in greater detail, paragraphs 40-46 of the complaint identify statements made by the defendants during the second quarter press release and analyst conference call on July 24, 2007. In this section, the plaintiff alleges that NutriSystem's officers had "knowledge that Alli had already impacted and was continuing to impact NutriSystem's sales, revenues, and earnings." Id. ¶ 41. The complaint never

identifies which defendant knew this information, nor does it allege how or when this knowledge was obtained. Allegations of this form do not meet the specificity requirements of Rule 9 and the PSLRA as detailed in Avaya and In re Rockefeller.

Similarly, paragraphs 52-53 of the complaint identify a statement made by Hagan on October 3, 2007, as part of the company's preliminary earnings announcement, acknowledging "shorter-term competitive pressures" that increased customer acquisition costs and rendered marketing spending less efficient. The plaintiff alleges that "the complete truth regarding the business of NutriSystem and its already failing business model was still concealed by the defendants." Id. ¶¶ 52-53. Again, the complaint fails to identify what additional information needed to be disclosed in order to render the statement not misleading, nor does it identify what Hagan knew or should have known that was not already disclosed. As such, these allegations fail to meet the specificity requirements of the PSLRA.

Having agreed with the defendants that many of the allegations in the complaint fail to identify false statements with specificity, the Court will address the allegations of paragraph 63 that have been sufficiently pleaded.

2    Statements Rendered Immaterial by the PSLRA Safe
     Harbor

      With respect to the remainder of the complaint, the
Court concludes that the statements adequately alleged to be
false are protected by the PSLRA safe harbor provision for
forward-looking statements.  As a result, such statements are
immaterial and may not serve as the basis for a Rule 10b-5 claim.

      The PSLRA's safe harbor provisions protect forward-
looking statements made by companies, provided that the
statements are identified as forward-looking and accompanied by
meaningful cautionary statements that identify important factors
with the potential to cause actual results to differ materially
from the predictions made in a forward-looking statement.  15
U.S.C. § 78u-5(c)(1).  A forward-looking statement may be a
projection of revenues, income, earnings, capital expenditures,
dividends, capital structure, or other financial items.  Id.
Cautionary language must be related to the forward-looking
statements but need not actually accompany them.  See GSC
Partners CDO Fund v. Washington, 368 F.3d 228, 243 n.3 (3d Cir.
2004).  Prior to the PSLRA's statutory protection of forward-
looking statements, courts had developed the bespeaks caution
doctrine, which operated with similar effect; alleged
misrepresentations or omissions were held immaterial to a
reasonable investor if accompanied by sufficient cautionary
language relating directly to the alleged misstatements.  Avaya,

564 F.3d at 255; <u>see also</u> <u>GSC Partners</u>, 368 F.3d at 228; <u>EP
Medsystems, Inc. v. EchoCath, Inc.</u>, 235 F.3d 865, 873 (3d Cir.
2000).

   The plaintiff argues that statements made outside of
earnings predictions and guidance are not protected by the safe
harbor because they are not forward-looking, including
descriptions of Alli's impact as "temporary" and NutriSystem's
business model as "strong."  Plaintiff argues that these are
statements of present fact.  Opp'n at 19-20.  A statement is not
forward-looking if its accuracy can be determined at the time it
is made.  <u>Harris v. Ivax Corp.</u>, 182 F.3d 799, 805 (11th Cir.
1999).  NutriSystem's business model could not be verified as
strong without examining its future performance, and adjectives
such as "temporary" clearly make a prediction as to duration that
is unverifiable at the time they are used.  The Court finds that
these statements were not verifiable at the time they were made,
and are forward-looking statements protectable by the PSLRA's
safe harbor.

   Each of the statements alleged by the plaintiff to be
false was made in a press release or analyst conference call
accompanied by language invoking the PSLRA safe harbor for
forward looking statements.  <u>See</u> Defs'. Br. Ex. 2-12.  At the
beginning of the July 24 analyst call, for example, Brown invoked
the PSLRA's safe harbor for forward-looking statements, including

"statements that are preceded by, followed by, or include the words believes, plans, intends, expects, anticipates, or similar expressions." Id. Ex. 7 at 7. Later in the call, Hagan made one of the statements the plaintiff characterizes as false or misleading, saying: "[W]e believe it [Alli's impact] is just a temporary type of thing and this is what we believe." Id. The comment was both preceded and followed by "we believe," rendering it well within the type of forward-looking statement NutriSystem sought to protect with its disclaimer.

In this and other conference calls with analysts, as well as press releases during the class period, risk factors with the potential to cause actual results to differ from predictions were identified by reference to NutriSystem's 2006 Form 10-K. That Form 10-K included warnings that a pharmaceutical competitor perceived as easier to use than the NutriSystem program could negatively impact results and harm the company's competitive position. The plaintiff contends that continued reference to the 10-K to identify risk factors renders these cautionary statements unmeaningful and mere boilerplate. 11/24/08 Tr. at 38. Boilerplate statements, however, refer to statements significantly more general than these, such as warning readers that an "investment has risks." Avaya, 564 F.3d at 256. The plaintiff further argues that repeated reference to the earlier SEC filing renders its cautionary language unmeaningful. Opp'n

37

21-22.  Though Alli, not being on the market at the time, is not
referenced by name in NutriSystem's 2006 Form 10-K, the
cautionary language in that filing does refer specifically to
competition from a drug therapy, and cautions that the company's
marketing efficacy is key to its financial success.  As in Avaya,
the defendants identified and disclosed the risks that were
allegedly realized throughout the class period; the fact that
NutriSystem's officers repeatedly voiced their belief that
competitive pressure from Alli would be temporary does not
nullify their cautionary statements.  Avaya, 564 F.3d at 258
n.27.

        The Court holds that statements characterizing Alli's
impact as "temporary" or a "near-term hiccup," as well as
statements that the company would be able to adjust its marketing
efforts in response to competitive pressures, are forward-looking
statements protected by the PSLRA Safe Harbor because they were
accompanied by meaningful cautionary language. Such statements
are therefore immaterial and may not serve as the basis for a
Rule 10b-5 claim.


        C.    Standing to Bring Claims Arising after October 4, 2007

        The defendants challenge the plaintiff's standing to
bring claims arising after its final alleged stock purchase on
October 4, 2007.  Defs'. Br. Ex. 18.   The plaintiff does not

dispute that its final purchase was made on that date, as noted in its petition for class certification.

Because Rule 10b-5 creates a private right of action only for those who purchase or sell securities, as opposed to those who merely hold them, a class action plaintiff must establish its own standing as a purchaser or seller of securities in order to represent the claims of other class members.[7]  Winer Family Trust, 503 F.3d at 325.  A lead plaintiff cannot use injury to other class members to establish its own standing. Klein v. Gen. Nutrition Cos., Inc., 186 F.3d 338, 345 (3d Cir. 1999).  As an individual, a lead plaintiff can only bring claims concerning alleged fraudulent activity occurring before its last sale or purchase.  Winer, 503 F.3d at 325.

The Court has dismissed all claims relating to statements made prior to the lead plaintiff's last purchase of NutriSystem shares.  The Court will therefore grant the defendants' motion with respect all claims arising out of statements made after the lead plaintiff's last purchase on October 4, 2007.

---

[7]    Constitutional standing requires:  (1) an injury-in-fact, meaning an invasion of a legally protected interest that is both concrete and particularized and actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130 (1992).

D.    Section 20(a) Claims

Section 20(a) of the Securities and Exchange Act imposes joint and several liability on any person who controls any person liable under any provision of the Act.  In re Alpharma Inc. Sec. Litig., 372 F.3d 137, 153 (3d Cir. 2004).  To be liable under Section 20(a), there must exist an independent violation of the federal securities laws.  Given the Court's dismissal of all Rule 10b-5 claims against NutriSystem and the individual defendants, the Court will also dismiss the Section 20(a) claim against Hagan, Brown, Connerty, and Blair.

IV.  Conclusion

The plaintiff has failed in its complaint to allege facts raising a strong inference of scienter.  Taken in its entirety, the complaint does not establish that the defendants acted with the state of mind required under the PSLRA.  The Court has found, pursuant to Tellabs and Avaya, that the plaintiff's proposed inference is neither compelling, nor cogent, nor at least as strong as competing inferences.  The Court has also found that the plaintiff has failed to allege that the defendants made false or misleading statements with the specificity required by the PSLRA.  As a result, the defendants' motion is granted and the plaintiff's complaint is dismissed.

An appropriate Order will be issued separately.